# EXHIBIT B

| | |
|---|---|
| DENVER COUNTY DISTRICT COURT<br><br>1437 Bannock Street<br>Denver, CO  80202<br><br>Plaintiff: Sarah Ashton-Cirillo<br><br>vs.<br><br>Defendants: Twitter, Inc.<br><br>*Attorneys for Plaintiff:*<br><br>Ian T. Hicks, Reg. No. 39332<br>The Law Office of Ian T. Hicks LLC<br>6000 East Evans Avenue, Building 1, Suite 360<br>Denver, Colorado, 80222<br>Telephone: (720) 216-1511<br>Facsimile: (303) 648-4169<br>E-mail: ian@ithlaw.com | DATE FILED: July 5, 2022 10:22 AM<br>FILING ID: 23786C9810574<br>CASE NUMBER: 2022CV31861<br><br><br>▲ COURT USE ONLY ▲<br><br>Case Number:<br><br>Division: |
| **PLAINTIFF'S COMPLAINT** ||

Sarah Ashton-Cirillo, by and through her undersigned counsel of record, The Law Office of Ian T. Hicks LLC, hereby respectfully files her Complaint and Jury Demand, as follows:

## I.     NATURE OF THE CASE

1.     This is a civil action against Twitter, Inc., one of the world's most ubiquitous social-media platforms.  Twitter's *raison d'être* is as a microblogging service where users post messages known as "tweets," and interact with other uses through replies, "likes," "retweets," and "quote tweets."  From its beginnings as an intercompany messaging service, Twitter has grown

into a ubiquitous feature of modern life, with over 330 million monthly users, including 69 million in the United States alone.

2. Unlike other social-media services, Twitter is unique its status as a primary vehicle for the dissemination of breaking news, and its users tend to be far more engaged than on other social-media platforms. From Donald Trump's infamous late-night *Tweetstorms*, to the latest breaking open-source intelligence during Russia's genocidal invasion of Ukraine, Twitter has become the vehicle favored overwhelmingly by journalists, insiders, and influential voices who have an outsized impact on the broader news cycle to connect with the public.

3. With great power comes great responsibility. Just as it can connect two voices on opposite sides of the planet, it can also become a breeding ground where hatred, intolerance, and disinformation are weaponized, unchecked by the traditional constraints of an editorial staff or even the natural circumspection that comes with a face to face interaction. These are facts. They are not opinions. Recognized and in fact, embraced by Twitter.

4. Across its online platform, there are dozens, if not hundreds, of pages of content righteously showcasing its purported inclusivity, global impact, and commitment to a culture of trust, respect, and safety. To that end, as a "purpose-driven company that does good," Twitter enacted an array of "safety rules" designed to bar "violence, harassment, and similar behavior that discourage people from expressing themselves." Sarah is a transgender author under contract for a large LGTBQ publication, who has been in Ukraine, near the front lines, for over 100 days.

5. She has been interviewed by the BBC and Forbes, among other organizations, and provides updates to tends of thousands of Twitter users several times a day. She has also been subjected to relentless abuse, harassment, and even death threats by other Twitter users. These are the precise types of behaviors that Twitter contractually agreed to make a good-faith effort to

prevent, and when they occurred, to ameliorate, once reported. Inexplicably, despite hundreds of reports of death threats, threats of violence, misgendering, abusive language, and hateful conduct to Twitter, it has done nothing.

6. Thus, in order to tell the story of the Ukrainian peoples' suffering through Twitter, Sarah is forced to herself endure abuse through the medium of an online platform that is serving the cruel and debased impulses of the Russian war-crimes machine. And Twitter refuses to act despite its immunity from liability were it to act consistently with its rules and policies. There are other motives are at work on behalf of Twitter. Its bad faith is at once both stunning and brazen. Sarah asserts claims for breach of contract, promissory estoppel, and breach of the duty of good faith and fair dealing, while seeking monetary damages and specific performance.

## II. PARTIES, JURISDICTION, AND VENUE

7. Sarah Ashton-Cirillo ("Sarah") is a natural person who is a resident and domiciliary of the state of Nevada. She is under contract with a large LGTBQ publication. At all times material to this action she has been in the nation of Ukraine, in the areas occupied or controlled by the Armed Forces of Ukraine.

8. Twitter, Inc., ("Twitter") is a corporation organized and existing under the laws of the state of California, with its headquarters located in San Francisco. Twitter operates one of the largest social-media platforms in the world, at Twitter.com, which focuses on a specific form of communication known as "microblogging." Twitter has approximately 330 million monthly users, and over 69 million users in the United States.

9. This Court has subject-matter jurisdiction in the form of diversity of citizenship under 28 U.S.C. 1332 because the amount in controversy exceeds $75,000.00 and the Plaintiff and Defendant are citizens and domiciliaries of different states. Moreover, this Court has

territorial jurisdiction in the form of specific personal jurisdiction under the Due Process Clause and C.R.S. § 13-1-124 because Twitter purposefully availed itself of the benefits and privileges of Colorado by directing its goods and services to this state.

### III.     GENERAL ALLEGATIONS

10. Sarah first joined Twitter as a user in December of 2015. She presently has 26,000 followers on the platform and herself follows 2,196 other users.

11. Since the inception of Russia's genocidal invasion of Ukraine on February 24, 2022 until the present, Sarah has been on assignment for a large LGTBQ publication.

12. Throughout this time period, often multiple times a day, Sarah has posted tweets through her account on Twitter to document the rapidly-changing events on the ground, as well as the impact of Russia's actions on the people of Ukraine.

13. The conflict between Russia and Ukraine has been labeled by many in the news media as the world's first social media war, where individuals on the ground have shared real-time or near real-time reports from the frontlines.

14. Additionally, due to the ubiquity of smartphones and related electronic recording devices, vast troves of photographs, drone videos, text messages, and other data have been made publicly available.

15. The speed and scope with which these items have been disseminated has provided an unprecedented window into the violence of war generally, and into the massive scale of Russia's genocidal actions more specifically.

16. For this first time in recorded history, the world can bear witness to the largest land war—as well as Russia's broad and sustained campaign of genocide—unfiltered and uncorrupted by any hidden agendas or undisclosed biases.

17. Sarah, from the inception of this conflict, has led the way. Using Twitter as her primary vehicle, she has provided a level of humanistic authenticity that stands in stark contrast to the callousness of war.

18. Unfortunately for Sarah, given her status as a transgender woman, she has been the subject of an unspeakable barrage of insults, threats of violence, threats of kidnapping, rape, and torture, along with the usual deluge of transphobic slurs.

19. The people of Ukraine, as well as the various departments of its government and military forces, have shown themselves to be immensely enlightened. Sarah has endured less discrimination in Ukraine that in the United States.

20. The same cannot be said for Russia and its allied nations, such as Chechnya. Russian politicians and its entertainment industry are openly hostile with respect to transgender men and women, as well as any LGBTQ lifestyles or their concerns.

21. Sarah chose Twitter as the medium to bring her day to day experiences to life because Twitter promised to take specific remedial and protective actions in response to the efforts of any third parties who attempted to use Twitter as an instrument of abuse in violation of its rules, policies, or terms of service.

22. Twitter has periodically updated its Terms of Service, which it describes as follows in its prefatory phrase:

> These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://support.twitter.com/articles/20172501) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

23. Section 1 describes Who May Use the Services:

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

24.     Section 3 describes the Terms with respect to Content on the Services posted by the user:

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

. . . .

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts).

25.     Section 4 of the Terms of Service describes some of the limitations placed upon Twitter users:

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://www.pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.
. . . .

26.      The Twitter Rules, which are incorporated as part of the Terms of Services as part

of the parties' contract, provide in relevant part as follows:

### Violent Threats Policy

**What is in violation of this policy?**

6

Under this policy, you can't state an intention to inflict violence on a specific person or group of people. We define intent to include statements like "I will", "I'm going to", or "I plan to", as well as conditional statements like "If you do X, I will". Violations of this policy include, but are not limited to:

threatening to kill someone;

- threatening to sexually assault someone;

- threatening to seriously hurt someone and/or commit a other violent act that could lead to

- someone's death or serious physical injury; and

- asking for or offering a financial reward in exchange for inflicting violence on a  specific person or group of people.

**Note**: We have a zero tolerance policy against violent threats. Those deemed to be sharing violent threats will face immediate and permanent suspension of their account.

## Abusive Behavior Policy

Twitter Rules: You may not engage in the targeted harassment of someone, or incite other people to do so. We consider abusive behavior an attempt to harass, intimidate, or silence someone else's voice.

### Rationale

On Twitter, you should feel safe expressing your unique point of view. We believe in freedom of expression and open dialogue, but that means little as an underlying philosophy if voices are silenced because people are afraid to speak up.

In order to facilitate healthy dialogue on the platform, and empower individuals to express diverse opinions and beliefs, we prohibit behavior that harasses or intimidates, or is otherwise intended to shame or degrade others. In addition to posing risks to people's safety, abusive behavior may also lead to physical and emotional hardship for those affected.

### When This Applies

### Using insults, profanity, or slurs with the purpose of harassing or intimidating others

We take action against the use of insults, profanity, or slurs to target others. In some cases, such as (but not limited to) severe, repetitive usage of insults or slurs where

7

the primary intent is to harass or intimidate others, we may require Tweet removal. In other cases, such as (but not limited to) moderate, isolated usage of insults and profanity where the primary intent is to harass or intimidate others, we may limit Tweet visibility as further described below. Please also note that while some individuals may find certain terms to be offensive, we will not take action against every instance where insulting terms are used.

**Wishing, hoping, or calling for serious harm on a person or group of people**

We do not tolerate content that wishes, hopes, promotes, incites, or expresses a desire for death, serious bodily harm or serious disease against an individual or group of people. This includes, but is not limited to:

- Hoping that someone dies as a result of a serious disease e.g., "I hope you get cancer and die."

- Wishing for someone to fall victim to a serious accident e.g., "I wish that you would get run over by a car next time you run your mouth."

- Saying that a group of individuals deserves serious physical injury e.g., "If this group of protesters don't shut up, they deserve to be shot."

**Encouraging or calling for others to harass an individual or group of people**

We prohibit behavior that encourages others to harass or target specific individuals or groups with abusive behavior. This includes, but is not limited to; calls to target people with abuse or harassment online and behavior that urges offline action such as physical harassment.

## Hateful Conduct Policy

Hateful conduct: You may not promote violence against or directly attack or threaten other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease. We also do not allow accounts whose primary purpose is inciting harm towards others on the basis of these categories.

Twitter's mission is to give everyone the power to create and share ideas and information, and to express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it. Our role is to serve the public conversation, which requires representation of a diverse range of perspectives.

We recognize that if people experience abuse on Twitter, it can jeopardize their ability to express themselves. Research has shown that some groups of people are disproportionately targeted with abuse online. This includes; women, people of

color, lesbian, gay, bisexual, transgender, queer, intersex, asexual individuals, marginalized and historically underrepresented communities. For those who identify with multiple underrepresented groups, abuse may be more common, more severe in nature and more harmful.

We are committed to combating abuse motivated by hatred, prejudice or intolerance, particularly abuse that seeks to silence the voices of those who have been historically marginalized. For this reason, we prohibit behavior that targets individuals or groups with abuse based on their perceived membership in a protected category.

**When This Applies**

Wishing, hoping or calling for serious harm on a person or group of people

We prohibit content that wishes, hopes, promotes, incites, or expresses a desire for death, serious bodily harm, or serious disease against an entire protected category and/or individuals who may be members of that category. This includes, but is not limited to:

- Hoping that an entire protected category and/or individuals who may be members of that category dies as a result of a serious disease, e.g., "I hope all [nationality] get COVID and die."

- Wishing for someone to fall victim to a serious accident, e.g., "I wish that you would get run over by a car next time you run your mouth."

- Saying that a group of individuals deserve serious physical injury, e.g., "If this group of [slur] don't shut up, they deserve to be shot."

- Encouraging others to commit violence against an individual or a group based on their perceived membership in a protected category, e.g., "I'm in the mood to punch a [racial slur], who's with me?"

**Incitement against protected categories**

We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories. This includes content intended:

- to incite fear or spread fearful stereotypes about a protected category, including asserting that members of a protected category are more likely to take part in dangerous or illegal activities, e.g., "all [religious group] are terrorists."

- to incite others to harass members of a protected category on or off platform, e.g., "I'm sick of these [religious group] thinking they are better than us, if

9

any of you see someone wearing a [religious symbol of the religious group], grab it off them and post pics!"

- to incite others to discriminate in the form of denial of support to the economic enterprise of an individual or group because of their perceived membership in a protected category, e.g., "If you go to a [religious group] store, you are supporting those [slur], let's stop giving our money to these [religious slur]." This may not include content intended as political in nature, such as political commentary or content relating to boycotts or protests.

- Note that content intended to incite violence against a protected category is prohibited under **Wishing, hoping, or calling for serious harm on a person or groups of people.**

We prohibit targeting individuals and groups with content intended to incite fear or spread fearful stereotypes about a protected category, including asserting that members of a protected category are more likely to take part in dangerous or illegal activities, e.g., "all [religious group] are terrorists."

**Repeated and/or non-consensual slurs, epithets, racist and sexist tropes, or other content that degrades someone**

We prohibit targeting others with repeated slurs, tropes or other content that intends to dehumanize, degrade or reinforce negative or harmful stereotypes about a protected category. This includes targeted misgendering or deadnaming of transgender individuals. We also prohibit the dehumanization of a group of people based on their religion, caste, age, disability, serious disease, national origin, race, ethnicity, gender, gender identity, or sexual orientation. In some cases, such as (but not limited to) severe, repetitive usage of slurs, epithets, or racist/sexist tropes where the primary intent is to harass or intimidate others, we may require Tweet removal. In other cases, such as (but not limited to) moderate, isolated usage where the primary intent is to harass or intimidate others, we may limit Tweet visibility as further described below.

27.     Throughout its Terms of Service, Twitter repeatedly promises that if the user reports the violations of its rules, prompt enforcement action will be taken.

28.     There are two variables that Twitter appears to utilize in determining how it will exercise its discretion in determining the severity of that enforcement action.

29.     First, the Rules indicate that Twitter will look to the type of Rule that is violated.

30. For example and without limitation, it states that it has a "zero tolerance policy" with respect to violent threats:

> **Note:** We have a zero tolerance policy against violent threats. Those deemed to be sharing violent threats will face immediate and permanent suspension of their account.

31. Second, Twitter will also look to the severity of the violation, which includes the user's history of violations and how gravely the violations undermine the rationale supporting the policy that was violated, which are a more general but still specifically-defined set of criteria, such as, for example and without limitation, is explained with respect to the abusive behavior policy:

> **Consequences**
>
> When determining the penalty for violating this policy, we consider a number of factors including, but not limited to, the severity of the violation and an individual's previous record of rule violations. The following is a list of potential enforcement options for content that violates this policy:
>
> - Downranking Tweets in replies, except when the user follows the Tweet author. Making Tweets ineligible for amplification in Top search results and/or on timelines for users who don't follow the Tweet author.
>
> - Excluding Tweets and/or accounts in email or in-product recommendations.
>
> - Requiring Tweet removal.
>
> - For example, we may ask someone to remove the violating content and serve a period of time in read-only mode before they can Tweet again. Subsequent violations will lead to longer read-only periods and may eventually result in permanent suspension.
>
> - Suspending accounts whose primary use we've determined is to engage in abusive behavior as defined in this policy, or who have shared violent threats.

32. To trigger an enforcement action, Twitter provided instructions that directed the user to report a violation either through a process within the application or using the desktop website.

33. Nowhere does Twitter state in its Rules, Policies, or any other document comprising its Terms of Service that it would fail and refuse to receive reports of alleged violations, fail and refuse to apply its stated criteria for identify violations and assessing penalties, or fail and refuse to uphold its Terms of Service, Rules, or Policies.

34. In fact, Twitter states precisely the opposite. It proclaims that it is a communications platform with a global reach, committed to altruistic goals of inclusiveness, healthy interactions, and nondiscrimination. Each of its Policies are underpinned by an explicit rationale, a purpose, tied to its enforcement framework.

35. Since the inception of Russia's genocidal invasion of Ukraine, Sarah has regularly utilized Twitter to give life and texture to the suffering, bravery, and steadfastness of the Ukrainian people.

36. She has posted original content, often multiple times a day, which when combined with her replies, likes, and other engagements, includes approximately 10,000 separate communications with her followers and others.

37. She has spent time in Lviv, Kharkiv, Ivano-Frankvisk, and dozens of other settlements and villages, always near the clamor of the largest land war in Europe since the darkest days of World War II.

38. In a conflict that has been marred by a constant stream of Russian disinformation and propaganda, she has provided a consistent window into conditions on the ground.

39. Unfortunately, Sarah during this time, it was not enough to be subjected to the risks of an errant bomb or a sniper's bullet, or the lifelong emotional scars of bearing witness to the horrors of war.

40. Sarah was also subjected to something entirely preventable, yet equally traumatizing: being relentlessly harassed, threatened, and attacked on Twitter.

41. These efforts ran the gamut from transphobic insults, to purposeful misgendering, to the most vile and vulgar insults, as well as explicit threats to commit acts of torture, maiming, kidnapping, rape, and murder.

42. Sarah reported, as directed by Twitter, these acts at least several dozen times to Twitter. Each time Twitter confirmed that her report had been received.

43. And, just as consistently, Twitter simply went dark, failed to take any action, and never informed Sarah as to how such a blitzkrieg of attacks did not violate Twitter's Terms of Service.

44. Sarah's reports to Twitter involved clear and obvious violations of Twitter's Terms of Service, its Rules, and its Policies, including those related to violent threats, for which it claims to have a "zero tolerance policy."

45. Twitter's failures to meaningfully review Sarah's reports and its failure to take any enforcement action consistent with its Terms of Service, Rules, and Policies, which operate and are incorporated together, has deprived her of the benefits and reasonable expectations she had with respect to her contract with Twitter.

46. Every time she posts to Twitter, she is forced to effectively run a gauntlet of death threats, insults, misgendering, and vile hatred. This has its own brand of harm, but Twitter's total

inaction itself is devaluing, harmful, and creates lasting damage to both her emotions and the value of her name and likeness in the media.

## IV.     CLAIMS FOR RELIEF

### First Claim for Relief – Breach of the Duty of Good Faith and Fair Dealing

47.     Sarah incorporates by reference the foregoing allegations as if fully set forth herein.

48.     Sarah had a contract with Twitter as expressed in the Terms of Service.

49.     That contract included the Terms of Service, the Rules, the Policies, and all related content, documents, and promises.

50.     Under that contract, Twitter had the ability to exercise a certain degree of discretion in identifying violations of its Terms of Service, its Rules, and its Policies, as well as in assessing penalties for those violations.

51.     However, despite numerous obligations and opportunities to enforce violations of its Terms of Service, its Rules, and its Policies that were reported by Sarah.

52.     Those manifold failures were undertaken in bad faith, were a breach of the contract, and deprived Sarah of the benefits and reasonable expectations she had with respect to Twitter's operation of its platform.

53.     This constitutes a breach of the duty of good faith and fair dealing, causing Sarah to suffer injuries, damages, and losses in an amount to be proven at trial.

**Second Claim for Relief – Breach of Contract**

54. Sarah incorporates by reference the foregoing allegations as if fully set forth herein.

55. Sarah and Twitter formed a contract. That contract included the Terms of Service, the Rules, and its Policies, and all related documents, communications, and content.

56. The contract required and obligated Twitter to take enforcement action to suspend, limit, or otherwise penalize accounts that repeatedly violated its Rules, Terms of Service, and Policies by directing hateful, violent, abusive, and threatening behavior at another user, especially where done so because of the other user's transgender status or national origin.

57. Despite numerous and in fact hundreds of reports from Sarah of accounts that were repeatedly and regularly threatening Sarah, and directing all manner of hateful, abusive, insulting and vulgar attacks at her personally because of her transgender status and national origin.

58. Worst of all, Twitter, has it is want to regularly do, repeatedly responded to Sarah's reports with opaque and generic statements that it was investigating the matter, but then simply went dark, was unresponsive to further inquiry, and left Sarah with the impression that it had lost or forgotten her reports.

59. Twitter also failed to take any enforcement action with respect to Sarah's reports, as if it was in fact ratifying the most awful non-violent behavior imaginable, including but not limited to threats of violence, death, kidnapping, sexual mutilation, and transphobic insults.

60. Twitter's manifold failures caused Sarah to suffer injuries, damages, and losses in an amount to be proven at trial.

**V.     PRAYER FOR RELIEF**

Sarah respectfully requests that the Court enter judgment in her favor on every claim, and award the following relief:

1. Economic Damages;

2. Equitable Relief including Injunctive Relief;

3. Specific Performance;

4. Attorney's Fees as Permitted by law or contract; and

5. Such other relief as the Court deems proper.


Dated this 5th day of July, 2022

*/s/ Ian T. Hicks, Esq.*
Ian T. Hicks, Reg. No., 39332
The Law Office of Ian T. Hicks LLC
Attorney for Plaintiff
6000 East Evans Avenue, Suite 1-360
Denver, Colorado, 80222
Telephone: (720) 216-1511
Facsimile: (303) 648-4169
E-mail: ian@ithlaw.com

Plaintiff's Address Withheld for Security Reasons